UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

---

| | |
|---|---|
| KANSAS CITY SOUTHERN RAILWAY CO. | CIVIL ACTION NO. 13-838 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS & TRAINMEN, ET AL. | MAGISTRATE JUDGE HORNSBY |

---

### MEMORANDUM ORDER

In this labor dispute, the Kansas City Southern Railway Co. ("KCSR") and two unions, the Brotherhood of Locomotive Engineers & Trainmen and the United Transportation Union ("the Unions"), are at odds over a decision by KCSR to install inward facing video-cameras in its locomotive cabs. It is not for this Court to decide whether the cameras will be permitted. However, this Court does have a say in the method by which that question will be answered. The parties have filed cross-motions seeking a ruling on whether their dispute is "major" or "minor" under the Railway Labor Act ("RLA"). 45 U.S.C. § 151 *et seq.* If the dispute is major—roughly speaking, a dispute over the creation of a new contractual right—then the parties must bargain over the proposed modification to the collective bargaining agreement ("CBA"). In the event the RLA's dispute resolution procedures fail, the parties may resort to economic force. If the dispute is minor—roughly, a dispute over the proper interpretation of a CBA provision—then it will be resolved through binding arbitration. For the following reasons, the Court finds that this dispute is

minor, **GRANTS** KCSR's Motion for Summary Judgment, and **DENIES** the Unions' Motion for Status Quo Injunction.

## I.     Factual and Procedural Background

On April 24, 2013, KCSR notified representatives of the Unions that it would install two new inward-facing cameras in all of its locomotive cabs. These cameras would be used, in part, to help discipline employees. Unbeknownst to the Unions, KCSR had already installed these cameras in the locomotives located in Mexico. KCSR stated that it had arrived at its decision to install the cameras unilaterally and that it would not bargain over it. [Record Document 13-1, p.8]. At the same time KCSR notified the Unions of its intentions, it filed this suit seeking a declaratory judgment that any disputes "over the pending installation and operation of inward-facing video cameras in locomotive cabs are 'minor disputes'…" [Record Document 1, p.1]. Both parties agree that no written agreement between the parties governs whether such cameras are permitted.

In its prayer for relief, KCSR requests a judgment declaring the following:

1)   any disputes with the Unions over KCSR's right to install and use inward-facing cameras in locomotive cabs is a "minor dispute" subject to handling under Section 3 of the RLA, 45 U.S.C. § 153; and

2)   any use of self-help by the Unions over installation or use of inward-facing cameras, in derogation of the mandatory dispute resolution procedures of Section 3 of the RLA, would be unlawful.

[Record Document 1, pp.12-13]

The parties have now filed cross-motions—KCSR for summary judgment and the Unions for a preliminary status quo injunction. Both motions frame the issue before the Court as whether this dispute is major or minor under the RLA. 45 U.S.C. § 151 *et seq.* KCSR's motion advances two arguments:

1) Numerous decisions of the Adjustment Board hold that the railroad industry is a "reserved rights industry," meaning that in the absence of a restriction negotiated by the union the carrier may alter working conditions unilaterally.[1] It is thus arguable that KCSR has the contractual right to alter working conditions in any way the CBA does not prohibit. None of the terms in the

---

[1] In its briefing, KCSR occasionally uses the term "managerial prerogative" to refer to the idea that rail carriers may modify working conditions as they please in the absence of a restriction negotiated by the union. Counsel for KCSR clarified during oral argument that by "managerial prerogative" he did not intend to invoke management's right to make decisions that lie at the core of entrepreneurial control of the business, such as selling a rail line or setting executive compensation unilaterally. Counsel for KCSR conceded at oral argument that the cameras proposed would change working conditions, and thus do not fall within the core of entrpreneurial control of the business. Judge Posner explained managerial prerogative as follows in <u>Chicago & Nw. Transp. Co. v. Ry. Labor Exec. Ass'n</u>:

> The two types of carrier's entitlement to act unilaterally—contractual and prerogative—are not sharply distinct, if indeed they are distinct at all. A matter of prerogative is one the carrier is not required to bargain over and therefore is unlikely to surrender in bargaining, though nothing in the Act forbids it to do so. If there has been no waiver of prerogative in the collective bargaining agreement, then the union cannot insist that the carrier bargain over prerogative matters, such as executive perks, recapitalization, rates charged shippers, and other matters that are only indirectly—though often vitally—related to the status of the workers represented by the union. The union's insistence on bargaining over such matters confers no rights under section 6.

908 F.2d 144, 152 (7th Cir. 1990) (citations ommitted).

    CBA prohibits installation of the cameras. Therefore KCSR may install them; and

2)    Even if KSCR has not reserved the right to install the cameras, an implied agreement created by past practice arguably allows KCSR to install them. KCSR cites the Unions' consent to the following practices as evidence of an informal agreement wherein the Unions' employees agree be monitored by KCSR:

- use of stationary surveillance cameras in various train yards and other locations around the KCSR system;

- use of inward-facing cameras in crew vans that transport KCSR crews to and from train assignments;

- implementation of procedures for monitoring and recording phone calls between train crew employees and crew management when crew management calls an employee and advises him or her when to report to staff a particular train;

- operational testing of train crews without prior notice, including "check rides" and unannounced observation by supervisors; and

- downloading and reviewing data from locomotive monitoring devices, including event recorders and "wi-tronix," for the purpose of assessing train crew rules compliance and train handling skills.[2]

If either of these arguments prevails, then the dispute turns on the interpretation of the parties' existing agreement; and thus this dispute would be classified as a minor dispute over which the arbitration board has exclusive jurisdiction.

---

[2]The wi-tronix system enables managers at the carrier's headquarters to obtain train data in realtime.

The Unions counter the reserved-rights argument by noting that arbitration decisions have no precedential value and that KCSR has presented no evidence that an implied reserved-rights term is part of this particular CBA. Regarding KCSR's second argument, the Unions argue that the proposed cameras are so much more intrusive than the monitoring practices cited by KCSR that those practices do not even arguably support an implied agreement permitting installation of the cameras. Furthermore, the Unions note that the following monitoring practices do not demonstrate the Unions' consent to be monitored because they are required by federal regulations:

- observation of train crews by managers, required by 49 C.F.R. §§ 240.129(e), 242.123, and 242.403(e)(6)-(11));
- check rides, required by 49 C.F.R. § § 240.129(c), 240.123; and
- installation of event records, required by 49 C.F.R. § § 240.129(c)(3).[3]

The dispute is therefore major, the Unions argue, because it cannot be resolved by interpreting the agreements between the parties. Thus, the unilateral imposition of such a change in working conditions without bargaining is prohibited by the RLA. 45 U.S.C. § 152 Seventh and 45 U.S.C. § 156. If the Unions' argument is correct, KCSR must maintain the status quo while the bargaining and the voluntary dispute resolution measures of the RLA run their course. A preliminary injunction preserving the status quo, as authorized by the RLA, is therefore appropriate, the Unions contend.

---

[3] The wi-tronix realtime monitoring system is not required by federal regulations.

**II.     The Law**

Summary judgment should be entered if the movant "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a labor dispute is major or minor is a question of law. CSX Transp., Inc. v. Bhd. of Maint. of Way Emp., 327 F.3d 1309, 1320 (11th Cir. 2003) (collecting cases). The Unions have pointed to no genuine disputes of fact that are material to the question of whether this dispute is major or minor.

A principal aim of the RLA is to channel disputes through an "interminable" process of conferences, meditation, and voluntary or compelled arbitration in order to avoid strikes. 45 U.S.C. § 151a; Detroit & Toledo Shore Line Ry. Co. v. United Transp. Union, 396 U.S. 142, 149 (1969) ("A final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process."). In order to determine the proper channels through which a dispute must travel, courts distinguish between major and minor disputes. Burlington Northern R. Co. v. United Transp. Union, 862 F.2d 1266, 1271 n.4 (7th Cir. 1988). Major disputes involve the creation or alteration of contractual rights and duties:

> disputes over the formation of agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not assertion of rights claimed to have vested in the past.

Consol. Rail Co. v. Ry. Labor Exec. Ass'n, 491 U.S. 299, 302 (citing Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 723 (1945)).

Minor disputes arise "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." Major disputes must pass first through conference, mediation, possibly voluntary arbitration, and a thirty day cooling-off period before either party may resort to economic self-help. During this protracted process both parties must maintain the status-quo, understood as the objective working conditions that pertain to the dispute, whether or not those working conditions are governed by the CBA. Consol. Rail, 491 U.S. at 302-03; Shore Line, 396 U.S. at 152-53. Minor disputes are resolved through arbitration before the Adjustment Board. The Adjustment Board enjoys exclusive jurisdiction over minor disputes. Id. at 303-04. Only in exceptional circumstances, such as where "a disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless" will a court require the carrier to maintain the status quo during arbitration of a minor dispute. Int'l Bhd. of Teamsters v. Southwest Airlines Co., 875 F.2d 1129, 1136 (5th Cir. 1989).

The party who initiates the dispute can thus to a certain extent control whether it is major or minor by choosing to characterize their action as either as an effort to change a right created by the CBA or as an effort to enforce an existing right. Consol. Rail, 491 U.S. at 306. To prevent a party from unilaterally imposing new working conditions without bargaining, in violation of 45 U.S.C. § 152 Seventh,[4] by erroneously claiming an action

---

[4] 45 U.S.C. § 152, Seventh:
Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden

prohibited by the CBA is actually permitted, the party proposing the change must make a preliminary showing that the dispute is minor before a federal court determines that the Adjustment Board has exclusive jurisdiction. Id. A dispute is minor if the proposed action is arguably justified by the terms of the parties' collective bargaining agreement and the argument justifying the action under the CBA is neither frivolous nor obviously insubstantial:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

Consol. Rail, 491 U.S. 299, 302-303 (1989). Thus, even a dispute concerning a decision by the carrier that changes the working conditions of employees — that is, a decision that would otherwise trigger the carrier's duty to bargain under Section 152, First — must be resolved by the Adjustment Board if the CBA arguably allows the action.[5]

---

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

[5] 45 U.S.C. § 152, First reads:

" Duty of carriers and employees to settle disputes
It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

It is well settled that the CBA does not only include the written agreements between the parties, but also all implied terms created by the parties' course of dealing:

> [C]ollective-bargaining agreements may include implied, as well as express, terms. Furthermore, it is well established that the parties' practice, usage and custom is of significance in interpreting their agreement. This Court has observed: A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. ... [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law-the common law of a particular industry or of a particular plant.

Consol. Rail, 491 U.S. at 311-12 (citations and quotation marks omitted). Not all past practices create implied obligations, only those accompanied by assurances of continuation or that are likely to induce reliance. Chicago & Nw.Transp. Co., 908 F.2d at 154 (7th Cir. 1990) ("Practices accompanied by assurances of continuation, express or implied but in either event likely to induce reliance, can create an implied obligation.") (collecting cases).

### III. Analysis

KCSR first argues that those arbitration decisions recognizing that the railroad industry is a "reserved rights" industry show that it is at least arguable that KCSR has a contractual right to alter working conditions in any way not prohibited by the CBA.[6] A handful of federal cases appear to have noted that rail carriers, at least arguably, retain the right to do whatever the CBA does not forbid. Chicago & Nw.Transp. Co., 908 F.2d

---

[6]These arbitration decisions are found in footnote 6 at page 9 of Kansas City's Memorandum in Support of its Motion for Summary Judgment [Record Document 14-1, p.9 n.6].

at 155 ("what the agreements do not expressly or implicitly forbid they permit"); Airline Professionals Ass'n v. ABX Air, Inc., 274 F.3d 1023, 1029 (6th Cir. 2001) (citing Appalachian Reg'l Healthcare, Inc. v. United Steelworkers of Am., 245 F.3d 601, 606 (6th Cir. 2001) ("The Agreement need not include provisions permitting management action on every conceivable employment matter; rather, on issues not discussed in the Agreement, management retains discretion."). KCSR has not presented any evidence apart from the fact that it is a railroad that this particular CBA contains an implied managerial rights term.

The Court is reluctant to hold that adjustment board decisions interpreting the CBAs of other unions and other carriers make it arguable that this rail carrier may unilaterally change working conditions that are unregulated by the CBA. As noted by Judge Easterbrook in a case distinguishing between enforcement and interpretation of an Adjustment Board award, "equating arbitration with a common-law system of adjudication is hazardous." Bhd. of Maint. of Way Emp. v. Burlington N. Ry. Co., 24 F.3d 937, 939 (7th Cir. 1994). Whereas common-law courts typically "enforce the minor premises contained in opinions from the same or a higher level of our hierarchical judiciary," arbitrators bear a closer resemblance to civil law courts, whose judgments do not have *stare decisis* effect. Id. Furthermore, as counsel for KCSR conceded during oral argument, the arbitration decisions and circuit cases cited by KCSR do not always distinguish carefully between the concepts of "retained rights," as

understood by KCSR, and managerial prerogative, meaning those decisions over which KCSR need not bargain.

In any case, the Court need not resolve the complex issues posed by KCSR's first argument because it is arguable that the implied agreements between the parties concerning monitoring allow the installation of the cameras. Not considering, for the sake of argument, the check-rides and event-recordings, which are mandated by federal regulations, KCSR cites the following employee monitoring practices:

- use of stationary surveillance cameras in various train yards and other locations around the KCSR system;

- use of inward-facing cameras in crew vans that transport KCSR crews to and from train assignments;

- implementation of procedures for monitoring and recording phone calls between train crew employees and crew management when crew management calls an employee and advises him or her when to report to staff a particular train;

The Unions do not dispute that they have consented to these practices and that they form part of their implied agreements with KCSR. Instead, the Unions distinguish each past practice in order to show that the proposed monitoring is unprecedentedly intrusive:

> Radio conversations between crews and train dispatchers are simply part of the locomotive operating process; a train cannot move without conversations in which dispatchers convey authority for movements… Cameras in front of locomotives record what a locomotive confronts along the way; they are not employee surveillance devices. Stationary pole-mounted cameras randomly put up around yards or trackside are not employee-monitoring systems; they are security systems which only incidentally might be used to monitor employees… Finally, to suggest that recording phone calls in which management tells train

> crews who are off from work when to report to work is analogous to in-cab video surveillance borders on the absurd.

[Record Document 13-1, p.18].

While the burden on the carrier to show that its right to act is arguably justified by past practices is light, it is not non-existent. If a carrier were to cite past practices that were so far removed in magnitude and nature from the decision at issue as to make the carrier's justification obviously insubstantial, then the carrier would not have met its burden. The Court, however, is not faced now with such a situation. It is clear that the Unions have consented to some monitoring. What is not clear is whether they have consented to monitoring directed at them 24/7. KCSR has advanced the argument that by not voicing any objection to the stationary pole-mounted cameras in the yards, the recording of employee phone calls, and the use of inward-facing cameras in the vans that transport KCSR crews to and from train assignments, the Unions have agreed to be monitored to the extent reasonably necessary to meet the safety challenges faced by KCSR. This argument is not frivolous. Neither is it frivolous to argue that the safety challenges posed by employees using personal electronic devices on the job necessitates the camera and review system proposed by KCSR. At the end of the day, the Unions may prevail regarding their interpretation of the CBA. KCSR's argument, however, is not "obviously insubstantial," and thus the dispute is minor.

The Court is not persuaded that a status quo injunction should be entered while this dispute proceeds through arbitration. The Fifth Circuit has held that the "proper grounds for granting an injunction against action that is the subject matter of a minor

dispute under the RLA are extremely narrow." Southwest Airlines Co., 875 F.2d at 1136. The "speculative possibility" that an employee may suffer harm to their reputation from being disciplined does not rise to the "magnitude required to support an injunction in the context of a minor dispute." Id. The Unions argue that the employee stress caused by these cameras is an irreparable harm. In support, the Unions cite three studies concluding that continuous monitoring induces stress in those monitored and reduces their ability to perform their work.[7] The Court finds that the risk that employees may suffer stress because of these cameras is a speculative possibility that does not support an injunction in this context. The harm posited by the Unions is not so irreparable that it would render an arbitration decision in the Unions' favor meaningless. Id. The use of the cameras by KCSR during arbitration proceedings would in no way prevent a decision by the Adjustment Board adverse to KCSR from taking effect. Furthermore, both parties agreed at oral argument that in the event of an arbitration decision in the Unions' favor, any aggrieved employees could seek some form of monetary compensation from their injuries. The Court will not, therefore, require KCSR to maintain the status quo while this minor dispute runs its course.

---

[7] Aiello, J.R., and Svec, C.M., *Computer Monitoring of Work Performance: Extending the Social Facilitation Framework to Electronic Presence*, JOURNAL OF APPLIED SOCIAL PSYCHOLOGY 23(7), 1993, at 537-548; Davison, Rick and Henderson, Ron, *Electronic Performance Monitoring: A Laboratory Investigation of the Influence of Monitoring and Difficulty on Task Performance, Mood State, and Self-Reported Stress Levels*, JOURNAL OF APPLIED SOCIAL PSYCHOLOGY 30(5), 2000, at 906-920; Aiello, J.R., and Kolb, K.J., *Electronic Performance Monitoring and Social Context: Impact on Productivity and Stress*, JOURNAL OF APPLIED PSYCHOLOGY 80(3), 1995, at 339-353.


## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** KCSR's Motion for Summary Judgment [Record Document 14], and **DENIES** the Unions' Motion for Status Quo Injunction [Record Document 13].

**THUS DONE AND SIGNED** this 24th day of July, 2013.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE